## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**CASE NO.** 6:09-cv-1674-Orl-35DAB

SECURITIES AND EXCHANGE COMMISSION,⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀**Plaintiff,**⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
**v.**⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MICHAEL A. RIVERS,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀**Defendant, and**⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ARKR TRUST LLC,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀**Relief Defendant.**⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## COMPLAINT FOR INJUNCTION AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges as follows:

## INTRODUCTION

1.⠀⠀⠀⠀From January 2006 to January 2009, Defendant Michael A. Rivers served as the Chief Executive Officer of IBSG International Inc. ("IBSG"), a publicly traded software company. As IBSG's most senior officer, Rivers directed the company to distribute a series of press releases announcing either software licensing agreements that did not exist or potential revenues from agreements without disclosing that IBSG had waived payment of licensing and servicing fees that were going to generate the revenues.

2.⠀⠀⠀⠀In addition, Rivers was responsible for IBSG recognizing more than $23 million in fictitious revenues from these purported licensing agreements on the company's financial statements and in periodic reports publicly filed with the Commission.

3.      At the same time Rivers directed IBSG to report the fictitious software licenses and revenues, he directed the sale of at least 1.1 million shares of IBSG common stock from brokerage accounts that he and his wife maintained in the name of a nominee company, Relief Defendant ARKR Trust LLC ("ARKR").   The stock sales generated approximately $1.23 million in proceeds.

4.      On January 6, 2009, Rivers resigned his position as IBSG's CEO.  Six days later, IBSG informed investors they could not rely on the company's financial statements and disclosed it was conducting an internal investigation of its assets and revenues.  In March 2009, IBSG discontinued all of its operations because of a lack of funds.

5.      By engaging in this conduct, Rivers violated Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Exchange Act Rules 10b-5, 13a-14, 13b2-1 and 13b2-2, 17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2.  He also aided and abetted IBSG's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13. Unless enjoined, Rivers is reasonably likely to engage in future violations of the federal securities laws.

## DEFENDANT AND RELIEF DEFENDANT

6.      Rivers, 44, maintains a residence in Windermere, Florida.  Rivers served as IBSG's CEO from November 2003 until January 6, 2009.

7.      Relief Defendant ARKR is a Delaware limited liability company with a principal place of business in Orlando, Florida.  Kim Rivers, Rivers' wife, is the sole officer and managing director of ARKR.

2

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

9.    The Court has personal jurisdiction over Rivers and venue is proper in the Middle District of Florida because IBSG maintained a principal place of business in the Middle District, and Rivers undertook numerous acts in the District that constitute the violations set forth in this Complaint.  Rivers also maintains a residence in the District.

10.    Rivers, directly and indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices and courses of business set forth in this Complaint.

## IBSG ISSUED FALSE AND MISLEADING PRESS RELEASES ABOUT LICENSE SALES IN SOUTH AFRICA

11.    Between January 2006 and January 2009, IBSG marketed an Internet-based, business software it had developed for small businesses.  In connection with that business, IBSG issued several press releases disclosing the purported sale of licenses for the software to various entities in South Africa, and the revenues the company would allegedly generate from the licenses.

12.    On January 11, 2006, IBSG and Rivers disseminated a press release announcing a license agreement with the South African Department of Trade and Industry ("DTI") that purportedly was to generate $37 million in revenues over four years, including $5.25 million in fees from the initial licensing and installation of the software.

13.    The following month, on February 27, 2006, IBSG and Rivers issued another press release disclosing that it had expanded the scope of the DTI agreement.  The press

3

release said the new agreement would likely generate revenues of approximately $50 million over four years, including $7.1 million in initial revenues.

14.     In reality, IBSG never had any licensing agreement with the DTI.  Although IBSG engaged in lengthy negotiations with the DTI and, in July 2008, entered into a Memorandum of Understanding with the agency, the DTI would not enter into a license agreement with IBSG because it was unable to verify financial and operational information about the company to its satisfaction.

15.     In addition, during the negotiations, DTI officials told Rivers the department would not pay IBSG for any licensing agreement.

16.     Two years later, from February through May 2008, IBSG and Rivers issued three press releases announcing agreements with three other business organizations in South Africa.  The first release, issued on February 19, 2008, disclosed IBSG had entered into a license agreement with Umuzi (Pty.) Ltd. ("Umuzi"), a South African business development company, which IBSG valued at $3 million over four years.

17.     The second release, issued on March 26, 2008, stated IBSG had entered into an agreement with Women in Finance, a South African organization promoting women in business, to offer IBSG's software to the organization's member businesses.  The press release valued the agreement at $3.2 million for IBSG over four years.

18.     The third release, issued on May 28, 2008, represented that IBSG had a license agreement with SEDA e-Thekwini, a DTI affiliate that provides business infrastructure facilities and other non-financial support to small businesses in South Africa, which was expected to generate $2.8 million in license fees over four years.

19.     Contrary to the representations IBSG and Rivers made in the three 2008 press releases, the company either did not have the license agreements the press releases described, or it failed to disclose it had signed side agreements waiving payments of the license fees.

20.     For example, IBSG signed a four-year license agreement with Umuzi on February 1, 2008, which called for the organization to pay IBSG $3 million in license, installation, training, and maintenance fees over four years.  But the same day, IBSG and Umuzi entered into a side agreement in which IBSG expressly agreed to waive payment of these fees.  The February 19, 2008 press release did not disclose this waiver.

21.     The press release announcing the agreement with Women in Finance was similarly misleading.  Although the group had signed an agreement with IBSG in February 2008, the agreement stated that Women in Finance was only required to pay IBSG its license and other fees out of revenue Women in Finance generated from the agreement.  The agreement further stated that Women in Finance would not be liable for any shortfall in payment of the $3 million in fees if it did not generate sufficient revenue from the agreement. In other words, the terms of the agreement did not make payment of the $3 million mandatory.

22.     IBSG's press release announcing the agreement with SEDA e-Thekwini also failed to disclose material information.  Although, in January 2008, IBSG and SEDA e-Thekwini had entered into a non-binding heads of agreement and, in July 2008, the DTI and IBSG had executed a memorandum of understanding, no final agreement with SEDA e-Thekwini or the DTI was ever executed because the DTI was unable to verify financial and operational information about IBSG it had to confirm before entering into such an agreement.

23.     Furthermore, IBSG never received any revenue from its purported agreements with the DTI, Umuzi, Women in Finance, or SEDA e-Thekwini.

### IBSG ALSO FALSELY REPORTED EUROPEAN LICENSE SALES

24.     On January 5, 2009, IBSG issued a press release announcing it had entered into a license agreement with the Hungarian Ministry of Economic Affairs valued at $7.7 million over four years.  The following day, the company issued another press release disclosing a license agreement with Finland's Ministry of Economic Affairs valued at $5.8 million over four years.

25.     In reality, IBSG never had any license agreements or other type of agreements with either government.  In fact, there had never been any communications between either ministry and IBSG, and ministry officials quoted in both press releases did not make the statements attributed to them.

### RIVERS DIRECTED IBSG TO ISSUE THE FALSE PRESS RELEASES

26.     Rivers directed and supervised all of IBSG's day-to-day business operations and its employees from January 2006 until he resigned his position as CEO in January 2009.

27.     Rivers furthermore reviewed and executed, or authorized the execution of, all of IBSG's license agreements, including the agreements it entered into with Umuzi and Women in Finance.

28.     Rivers participated in sales meetings and contractual discussions with the DTI, Umuzi, Women in Finance and SEDA e-Thekwini, and had numerous internal communications with IBSG representatives in Great Britain and South Africa who were helping negotiate the agreements.  Rivers was thus aware of the side agreement with Umuzi waiving payment of license and other fees, and was familiar with the payment terms of the

6

agreement with Women in Finance.  Because he was highly involved in every aspect of IBSG's operations, Rivers also knew there were no agreements with the DTI, SEDA e-Thekwini, and the ministries in Hungary and Finland.

29.     Rivers furthermore reviewed, edited and approved all of the press and earnings releases IBSG disseminated, including the press releases misrepresenting the license agreements with the DTI, Umuzi, Women in Finance, SEDA e-Thekwini and the Ministries of Economic Affairs for Hungary and Finland.

### IBSG'S FALSE PERIODIC REPORTS AND EARNINGS RELEASES

30.     Although IBSG did not have license agreements with the DTI and SEDA e-Thekwini, and had waived the license and service fees for the Umuzi and Women in Finance agreements, from October 2005 to November 2008, IBSG recognized approximately $23.4 million in revenues from the licenses on its financial statements.

31.     By recognizing the fictitious revenues from the four purported license agreements on its financial statements, IBSG materially overstated the revenues it reported on Forms 10-KSB it filed with the Commission for 2005, 2006 and 2007, and on Form 10-Q for the quarter and nine months ending September 30, 2008.

32.     In its 10-KSB for the year ending December 31, 2005, filed with the Commission on April 7, 2006, IBSG reported revenues of $7.7 million, including $3.2 million from the purported DTI agreement.  Because the DTI agreement did not exist, IBSG in reality overstated its 2005 revenues by $3.2 million, or 71 percent.

33.     IBSG overstated its 2005 revenues by the same 71 percent in an earnings release distributed on April 10, 2006, three days after it filed the 2005 10-KSB with the Commission.

34.     In its 10-KSB for the year ending December 31, 2006, filed with the Commission on March 29, 2007, IBSG reported revenues of $10.3 million, including $4.6 million from the purported DTI agreement.  Because the DTI agreement did not exist, IBSG in reality overstated its 2006 revenues by $4.6 million, or 81 percent.

35.     IBSG overstated its 2006 revenues by the same 81 percent in an earnings release issued on April 4, 2007, six days after it filed the 2006 10-KSB with the Commission.

36.     In its 10-KSB for the year ending December 31, 2007, filed with the Commission on April 1, 2008, IBSG reported revenues of $14.6 million, including $7.9 million from the purported DTI agreement.  Because the DTI agreement did not exist, IBSG in reality overstated its 2007 revenues by $7.9 million, or 118 percent.

37.     IBSG overstated its 2007 revenues by the same 118 percent in an earnings release issued on March 18, 2008, two weeks before it filed the 2007 10-KSB with the Commission.

38.     In its 10-Q for the quarter and nine months ending September 30, 2008, filed with the Commission on November 14, 2008, IBSG reported revenues of $12.9 million for the nine months ending September 30, including $7.7 million from the purported agreements with the DTI, Umuzi, Women in Finance, and SEDA e-Thekwini.  Because these agreements did not exist or IBSG had waived payment of the license and service fees, IBSG in reality overstated its revenues for those nine months by $7.7 million, or 148 percent.

39.     IBSG overstated its revenues for the nine months ending September 30, 2008 by the same 148 percent in an earnings release issued on November 19, 2008, fives days after it filed the 10-Q with the Commission.

8

40.    Moreover, on March 24 2008, IBSG filed a report on Form 8-K with the Commission incorporating an earnings release it issued to investors that materially overstated its revenues for 2007 by approximately $7.9 as result of the fictitious revenues it recognized from the purported DTI license.

41.    Rivers also participated in drafting and reviewed all of the reports described above that IBSG filed with the Commission reflecting the fictitious revenues from the South African licenses and materially overstating IBSG's revenues.  He also was responsible for earnings releases overstating the company's annual revenues for 2005, 2006, and 2007, and for the nine months ending September 30, 2008.

42.    Moreover, although Rivers knew the reports described above reflected fictitious license agreements and revenues, he certified in writing that the annual reports IBSG filed with the Commission for 2005, 2006, and 2007 and the quarterly report IBSG filed on September 30, 2008 were accurate pursuant to Rule 13a-14 under the Exchange Act, 17 C.F.R. § 240.13a-14.

43.    Further, despite his awareness that IBSG's financial statements for 2005, 2006, 2007 and 2008 reflected fictitious license agreements and revenues, Rivers provided IBSG's public auditors with signed management representation letters affirming there had been no fraud involving management.

## RIVERS DIRECTED THE SALE OF IBSG STOCK WHILE DIRECTING THE COMPANY TO MAKE THE FALSE REPORTS

44.    Over the course of the three-year period IBSG publicly reported the false license agreements and revenues, Rivers, assisted by his wife Kim, routinely sold shares of IBSG common stock into the market.  During the time of these sales, Kim Rivers was employed by IBSG as its Director of Human Resources and Administration.

45.     In early 2004, a family trust that Kim Rivers controlled received 1.5 million shares of common stock in IBSG at the direction of Rivers in connection with a reverse merger that brought the company public.  Between February 2005 and November 2008, this family trust received another 1.1 million IBSG shares directly from the company at the direction of Rivers, almost all of them in exchange for services Rivers rendered to IBSG as CEO and Board Chairman.

46.     Starting in April 2005 and continuing through November 2008, the family trust transferred 1.3 million of its shares acquired from IBSG to Relief Defendant ARKR.  Kim Rivers deposited these shares in at least three brokerage accounts she opened in ARKR's name.

47.     Between January 2006 and December 2008, Kim Rivers directed the sale of at least 719,361 IBSG shares from the ARKR brokerage accounts.  The stock sales generated approximately $1.1 million in proceeds.

48.     Kim Rivers sold 395,330 of the IBSG shares that ARKR had received on January 5 and 6, 2009, generating proceeds of approximately $85,000.  These sales coincided with the IBSG press releases announcing the fictitious licenses agreements with the Ministries of Economic Affairs for Hungary and Finland.  After IBSG issued the releases, IBSG's stock trading volume spiked 300%, allowing Kim Rivers to sell the shares held by ARKR.

**COUNT I**

**<u>Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5</u>**

49.     The Commission repeats and realleges Paragraphs 1 through 48 of this Complaint as if fully set forth herein.

50.     From at least January 2006 to January 2009, Rivers, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the purchase or sale of securities, as described in this Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which have operated or would operate as a fraud upon the purchasers of such securities.

51.     By reason of the foregoing, Rivers, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

### COUNT II

**Aiding and Abetting False Reports Filed in Violation of Section 13(a)
of the Exchange Act and Rules12b-20, 13a-1, 13a-11 and 13a-13**

52.     The Commission repeats and realleges Paragraphs 1 through 48 of this Complaint as if fully set forth herein.

53.     From at least April 2006 to November 2008, IBSG, under the control and at the direction of Rivers, did not file factually accurate current, quarterly and annual reports on Forms 8-K, Forms 10-Q and Forms 10-KSB with the Commission and failed to include material information in the reports that was necessary to make statements contained in the reports not misleading.

54.     By reason of the foregoing IBSG violated, and Rivers aided and abetted IBSG's violations of, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-

13.  Unless enjoined, Rivers is reasonably likely to continue to violate these provisions of the securities laws.

**COUNT III**

**Aiding and Abetting Failure to Maintain Accurate Books and
Records in Violation of Section 13(b)(2)(A) of the Exchange Act**

55.     The Commission repeats and realleges Paragraphs 1 through 48 of this Complaint as if fully set forth herein.

56.     From at least January 2006 to January 2009, IBSG, under the control and at the direction of Rivers, failed to make and keep, books, records, and accounts, which in reasonable detail, accurately and fairly reflected the transactions and dispositions of IBSG's assets.

57.     By reason of the foregoing, IBSG violated, and Rivers aided and abetted IBSG's violations of, Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A). Unless enjoined, Rivers is reasonably likely to continue to violate these provisions of the securities laws.

**COUNT IV**

**Aiding and Abetting Failure to Maintain an Adequate System of Internal
Accounting Controls in Violation of Section 13(b)(2)(B) of the Exchange Act**

58.     The Commission repeats and realleges Paragraphs 1 through 48 of this Complaint as if fully set forth herein.

59.     From at least January 2006 to January 2009, IBSG, under the control and at the direction of Rivers, failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (1) transactions were executed in accordance with management's general or specific authorization; (2) transactions were recorded as

12

necessary (a) to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements or (b) to maintain accountability of assets; (3) access to assets was permitted only in accordance with management's general or specific authorization; or (4) the recorded accountability for assets was compared with existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

60.     By reason of the foregoing, IBSG violated, and Rivers aided and abetted IBSG's violations of, Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B). Unless enjoined, Rivers is reasonably likely to continue to violate these provisions of the securities laws.

**COUNT V**

**Falsification of Books and Records and Failure to
Implement a System of Internal Accounting Controls in
Violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1**

61.     The Commission repeats and realleges Paragraphs 1 through 48 of this Complaint as if fully set forth herein.

62.     From at least January 2006 to January 2009, Rivers knowingly circumvented IBSG's internal accounting controls or knowingly failed to implement a system of internal accounting controls for IBSG, or knowingly falsified books, records, or accounts subject to Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2).

63.     By reason of the foregoing, Rivers, directly and indirectly, violated, and unless enjoined, is reasonably likely to continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

## COUNT VI

### Failure to Inform Accountants of Material Facts in Violation of Rule 13b2-2 under the Exchange Act

64.    The Commission repeats and realleges paragraphs 1 through 48 of this Complaint as if fully set forth herein.

65.    From at least January 2006 to January 2009, Rivers, directly or indirectly, made or caused to be made materially false or misleading statements or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit, review, or examination of IBSG's financial statements or the filing of reports required to be filed with the Commission.

66.    By reason of the foregoing, IBSG violated, and, unless enjoined, is reasonably likely to continue to violate, Rule 13b2-2 under the Exchange Act, 17 C.F.R. § 240.13b2-2.

## COUNT VII

### False Certification Filed by Principal Executive Officer

67.    The Commission repeats and realleges paragraphs 1 through 48 of this Complaint as if fully set forth herein.

68.    From at least April 2006 to November 2008, Rivers certified IBSG's financial statements to be accurate although they contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

69.    By reason of the foregoing, Rivers violated, and unless enjoined, is reasonably likely to continue to violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court:

### Declaratory Relief

Declare, determine and find that Rivers committed the violations of the federal securities laws alleged in this Complaint.

### Permanent Injunction

Issue a Permanent Injunction, enjoining Rivers, his officers, agents, servants, employees, attorneys, representatives and all persons in active concert or participation with him, and each of them, from violating Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B) and 78m(b)(5), and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13a-14, 13b2-1 and 13b2-2, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11,  240.13a-13, 240.13a-14, 240.13b2-1 and 240.13b2-2.

### Sworn Accountings

Issue an Order directing Rivers and ARKR to each file a sworn written accounting with this Court.

### Disgorgement with Prejudgment Interest

Issue an Order directing Rivers and ARKR to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### Penalty

Issue an Order directing Rivers to pay a civil money penalty pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

**Officer and Director Bar**

Issue an Order permanently barring Rivers from acting as an officer or director of a publicly-held company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. §78u(d)(2).

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

September 28, 2009                     By: _Robert K. Levenson_

Robert K. Levenson
Regional Trial Counsel
Florida Bar No. 0089771
Direct Dial No. (305) 982-6341
levensonr@sec.gov

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone No.:   (305) 982-6300
Facsimile No.:   (305) 536-4154